**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ALBERTO PERALES,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>DAVE DAVEY,<br><br>　　　　Respondent. | Case No. 1:16-cv-00019-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.**

**BACKGROUND**

On December 12, 2012, Petitioner was convicted after a jury trial in the Kings County Superior Court of first-degree murder and active participation in a criminal street gang. (1 CT[1] 242–44). The jury also found true the gang-murder special circumstance and three firearm enhancements. (1 CT 242–43). The trial court sentenced Petitioner to life without the possibility of parole for the murder count plus twenty-five years to life for one of the firearm enhancements, and stayed the sentences for the remaining enhancements and the active participation in a criminal street gang count. (2 CT 365). On January 5, 2015, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Perales, No. F066528, 2015 WL 114709, at

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on April 5, 2016. (ECF No. 18).

*7 (Cal. Ct. App. Jan. 5, 2015). The California Supreme Court denied Petitioner's petition for review on March 24, 2015. (LDs[2] 9, 10).

On November 30, 2015, Petitioner filed the instant federal petition for writ of habeas corpus in the Sacramento Division of the United States District Court for the Eastern District of California. (ECF No. 1). On January 7, 2016, the matter was transferred to the Fresno Division. (ECF No. 5). In the petition, Petitioner raises the following claims for relief: (1) insufficient evidence of express malice; (2) insufficient evidence of implied malice; (3) the trial court's refusal to give a requested instruction on involuntary manslaughter as a lesser-included offense; and (4) the trial court's erroneous pattern instruction on implied malice. On March 30, 2016, Respondent filed an answer. (ECF No. 17).

## II.

## STATEMENT OF FACTS[3]

### TRIAL EVIDENCE

*Mike Davis*

On July 14, 2011, a "registered"[4] Norteño named Mike Davis was with Cesar Montera, Miki Schell, Aaron Garcia and Salvador Sanchez at Lacey Park in Hanford. While the group was talking in the park, a black Honda arrived and stopped near the park on Florinda Street. Two people—one of whom was carrying a gun—jumped out of the car and ran towards Davis and his friends. Garcia began to run towards the southeast portion of the park, while Davis and his "buddies ran a different way," towards the southwest corner of the park.[5] Davis heard the gunman say, "[G]et that one," and run towards Garcia. As Davis continued to run, he heard one gunshot. Davis did not see the shooter because he was running away.

*Jose Contreras*

Jose Contreras is an assistant principal at Dinuba High School. On the day of the shooting, he was standing in the parking lot of a Catholic church across the street from Lacey Park.[6] Contreras observed three individuals chasing three other

---

[2] "LD" refers to the documents lodged by Respondent on April 5, 2016. (ECF No. 18).

[3] The Court relies on the California Court of Appeal's January 5, 2015 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Davis testified that he registered as a Norteño with the "Gang Task Force"—presumably a reference to a unit with the local law enforcement authorities. Davis testified that his registration resulted from a prior conviction for contributing to the delinquency of a minor. Davis was at a 'gang party' when the events underlying the conviction transpired. Davis testified that he does not consider himself a Norteño.

[5] Davis appeared to contradict this testimony at a later point during his examination. At one point, Davis testified that no one ran with him, and that he did not know whether anyone ran away with Garcia.

[6] Contreras did not recall the name of the park or the church. Contreras did note the church's location on the map, which placed it across the street from Lacey Park.

individuals in a southerly direction.[7] The individuals were "crossing the street at the park." "[S]hortly after they crossed the street," while Contreras' view of the individuals was blocked by a restroom,[8] Contreras heard a gunshot.

When the pursuers returned, Contreras noticed that one of the individuals was wearing blue latex gloves[9] and had a gun in his hand. The man with the gun said "something along the lines of 'I got him.'"

The next day, Contreras was presented with a photographic lineup by Officer Pontecorvo. One of the photographs looked "similar" to the man with the gun. Pontecorvo later testified that Contreras had identified defendant's photograph as the man who "could" have been the "guy with the gun."

*Cesar Montera*

Montera's Testimony

Cesar Montera was at Lacey Park the day of the murder. Miki Schell, Mike Davis, and Aaron Garcia also came to the park that day, and they were all at a bench under a gazebo. After they had been there around 30 minutes, a small car stopped on Florinda Street. Several[10] people jumped out of the car and ran towards Montera's group. One of the pursuers had a gun. Montera ran with Schell towards the intersection of Douty Street and Elm Street on the southwest side of the park. Garcia ran towards the intersection of Harris Street and Elm Street.[11]

Montera heard one gunshot. At some point thereafter, he saw Garcia's body near the intersection of Harris and Elm streets.

Montera testified that he did not recall the gunman's clothing, appearance, or whether he was wearing a glove. Nor did Montera recall identifying defendant as the shooter with 98 percent certainty.

Montera yawned throughout his testimony and unsuccessfully tried to "plead the Fifth."

*Montera's Police Interviews*

July 15 Morning Interview

Officer Brian Toppan interviewed Montera three times after Garcia's death. The first interview took place the morning after the incident. Montera said that a small Honda vehicle drove up with four occupants. The driver and another passenger remained in the vehicle, while two others exited. The eventual shooter yelled "Sur" and "Duke"[12] before both occupants began chasing Garcia.

---

[7] It appeared to Contreras that the individuals might have been affiliated with a gang because "[s]ome of the colors" on their clothing. Contreras testified that some of the individuals "might have been affiliated with the blue gang, which would be Sureños."
[8] In his oral testimony, Garcia said the restroom was "southwest" of the gazebo. His identification of buildings on a map of the area marked as Exhibit 5, however, indicates that the restroom was north of the gazebo.
[9] Contreras was not sure whether there was one latex glove or two.
[10] Montera testified that between two and four people exited the vehicle.
[11] Several exhibits showed that the intersection of Harris and Elm streets is located at the southeast corner of the park.
[12] Montera was somewhat equivocal about whether the shooter said "Duke." Montera said he was "pretty sure they said like Duke or something." A gang expert testified that the East Side Dukes is a Sureño subset that is well known throughout Hanford.

Montera described the shooter as an 18 or 19-year-old bald Hispanic wearing a white T-shirt, black Dickies pants, "blue Cortez's"[13] and gloves. Montera said he was "pretty sure" he would be able to identify the shooter again if he saw him.

Montera said that Garcia had been a Norteño as shown by the "4 dots on his face." Montera was "pretty sure" the shooting was retaliation for some prior interactions between the Sureño and Norteño gangs.

### July 15 Afternoon Interview

Later on July 15, Officer Toppan again interviewed Montera. Toppan showed Montera two photographic lineups with six photographs each. Initially, Montera said he did not recognize anyone in the lineups. Later, Montera said he knew "this guy"—referring to defendant. Montera said he had "problems" with defendant before. Defendant had caught Montera "doing things to" defendant's sister. Montera also knew that defendant was a "scrap" because he arrived in a blue Honda.[14] Toppan asked if defendant was the one who shot Garcia, and Montera replied that he did not know. Later, defendant said he was not sure, but "if anything that's the closest one."

### July 17 Interview

On July 17, Officer Toppan again interviewed Montera. Montera said he could not identify a person if he did not know who they were, and that he did not want to send someone to prison unless he was 100 percent sure. Nonetheless, he identified defendant as the shooter with "98 %" certainty. Toppan offered to show Montera the lineup again. Montera declined and said, "I know his picture," and that it was "not an image that just floats away...."

### *Miki Schell*

### Schell's Testimony

Miki Schell was with the group of people that included Montera. At the time of the shooting, she was dating Montera.

Schell testified that at one point, a car pulled up on Florinda Street. Two men exited, and one of them was wearing gloves and holding a gun. The two men ran towards Schell's group. Someone said, "[R]un," so Schell began to run away from the gunman. She never looked back, but she did hear the gun fire once.

At trial, Schell denied that she identified defendant as the gunman.

### Schell's Police Interview

Darren Matteson interviewed Schell before he retired as a detective with the Hanford Police Department. When Matteson showed Schell a six-person photographic lineup, she pointed to defendant's photograph and said he was the person running with the gun. She also said she was not "100 percent sure"[15] about her identification.

---

[13] Montera later explained that "Cortez's" are a type of Nike-brand shoe.

[14] Contextually, it appears that "scrap" is a term used to reference Sureño gang members. (See also *People v. Zepeda* (2008) 167 Cal.App.4th 25, 32 fn. 5.)

[15] This quotation comes from counsel's question, to which Matteson responded affirmatively.

4

Matteson testified that Schell told him that two "guys" ran up from a dark-colored Honda, one of whom was wearing blue gloves and was carrying a gun in his left hand. Schell also told Matteson that while she was running away, she heard someone yell: "Shoot that bitch."

### Post–Homicide Evidence

### Deborah Cervantes

On September 18, 2011, Officer Pontecorvo went to the home of defendant's mother, Deborah.[16] Officer Pontecorvo told Deborah he was there to arrest defendant for murder. Before Officer Pontecorvo had mentioned when the murder occurred, Deborah volunteered that defendant had been working that day. Deborah appeared intoxicated.

### Myses Cervantes

Myses Cervantes worked with defendant cleaning bounce houses for Myses's father.[17] Officer Pontecorvo interviewed Myses. Pontecorvo testified that Myses said defendant claimed to have killed somebody. Myses did not believe defendant. At trial, Myses denied having made these statements to Pontecorvo.

During his police interview, Myses said Deborah had also told him defendant killed someone. Myses told Deborah she should not be proud to tell people that her son had killed someone. At trial, Myses explained that he was talking hypothetically, and that he had not actually told Deborah not to be proud that her son killed someone.

During his interview with Officer Pontecorvo, Myses indicated that he once owned a blue Honda, but it had been repossessed.

### Tania Garcia

Myses's girlfriend, Tania Garcia,[18] testified that she once overheard defendant arguing with his then girlfriend, Marisol Bonilla. Bonilla said defendant "thought he was all hard because he had killed someone." Defendant did not respond. Bonilla, who was no longer romantically involved with defendant by the time of trial, denied having such a conversation with defendant.

Tania testified that Deborah told her that defendant had killed someone in Hanford. Tania also said that Myses told her defendant had killed someone. She was not sure when Myses told her this, just that it was sometime around June or July.

### Gilberto Cervantes

Gilberto Cervantes is Myses's father and Deborah's father-in-law. Gilberto owned a party supply rental business where defendant worked.

### *Gilberto's Interview with Police*

---

[16] Deborah's last name is identified in the record as, alternatively, "Arellano" and "Cervantes." We will refer to her by her first name to avoid any confusion.
[17] Myses used the term "jumpers," which is apparently a reference to bounce houses.
[18] Because Tania shares a last name with the victim, we will refer to her by her first name.

On September 20, 2011, Officer Pontecorvo went to Gilberto's home to interview him. As he was driving up to Gilberto's home, Pontecorvo noticed that Deborah was leaving the home. When Pontecorvo entered the home, he noticed several contracts from Gilberto's business laid out on the table. He asked Gilberto whether Deborah had asked him to retrieve the contracts and he said, "[Y]es." The contracts pertained to various dates including July 3, 4, and 17. None of the contracts pertained to July 14. Gilberto told Pontecorvo that he does not keep records of employee work times. Gilberto said he could not tell Pontecorvo the whereabouts of defendant on July 14.

Midway through the interview, Myses joined the conversation. Officer Pontecorvo testified that at one point, he told Gilberto that defendant had told Myses he had killed someone. Gilberto became upset with Myses and spoke to him in Spanish. In Spanish, Myses confirmed to Gilberto that defendant had told him he killed someone. Myses added that he did not believe defendant when he first heard.

*Gilberto's Trial Testimony*

At trial, Gilberto testified that defendant worked for him on the morning of July 14, but that he had no documentation to prove it. Gilberto contradicted Officer Pontecorvo's account by denying that Myses told him defendant said he had killed someone during his police interview.

Gang Expert

A gang expert testified that it was important for defendant to wear blue gloves because it openly displayed that a Sureño was committing the crime.

Garcia's Gunshot Wound

An officer who observed Garcia's body in the hospital said he had an entry or exit wound in his "lower left back area." The pathologist who performed the autopsy opined that the cause of Garcia's death was a single gunshot wound to the back. During the autopsy, it was determined that the bullet slug penetrated Garcia's sternum.

Perales, 2015 WL 114709, at *1–5 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Kings County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

///

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Sufficiency of the Evidence Claims

In his first and second claims for relief, Petitioner asserts that there was "no substantial evidence" of express malice or implied malice to support a valid conviction for murder. (ECF

1  No. 1 at 5, 7).[19] Respondent argues that the state court's denial of Petitioner's sufficiency of
2  evidence claim with respect to express malice is not contrary to, or an unreasonable application
3  of, Supreme Court precedent, and that there is sufficient evidence of implied malice. (ECF No.
4  17 at 23, 27).

### 1. Legal Standard

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (quoting Jackson, 443 U.S. at 319).

### 2. Express Malice

Petitioner asserts that there was no substantial evidence of express malice because: (1) the prosecution presented no evidence of what internal part of the body the single shot penetrated and thus, of how the victim bled to death; (2) the lack of evidence on the nature or distance of the shot, making it impossible to logically infer an intent to kill; and (3) the sharp upward trajectory between the shot's entry point and where it lodged, which creates a significant probability that the bullet ricocheted off the ground. (ECF No. 1 at 5).

Petitioner raised the sufficiency of evidence claim with respect to express malice on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look

---

[19] Page numbers refer to ECF page numbers stamped at the top of the page.

10

through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at 806.

In denying the sufficiency of evidence claim with respect to express malice, the California Court of Appeal stated:

> " ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104, original italics.)
>
> " 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.)" (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942.) "Malice is *express* when the killer harbors a deliberate intent to unlawfully take away a human life. Malice is *implied* when the killer lacks an intent to kill but acts with conscious disregard for life, knowing such conduct endangers the life of another." (*People v. Lasko* (2000) 23 Cal.4th 101, 104.)
>
> Here, there was substantial evidence of express malice. Specifically, there was evidence defendant fired a gun at the victim in a manner that *could have* inflicted a mortal wound. From this evidence the jury could have reasonably inferred an intent to kill. Indeed, in *People v. Smith, supra,* 37 Cal.4th at p. 733, our Supreme Court held that "the very act of firing a weapon ' "in a manner that *could have* inflicted a mortal wound ...' " is sufficient to support an inference of intent to kill. [Citation.]" (*Id.* at p. 742, italics added.) There is no dispute that substantial evidence supported an inference that a gunman[20] purposefully fired a weapon at Garcia and actually inflicted a mortal wound. Nothing more was required to raise an inference of intent to kill. (See *ibid.*)[21]
>
> Defendants' counter-arguments on this issue boil down to the claim that some evidence (e.g., the single shot, the entry wound) is also consistent with an intent to merely injure. Having concluded that the jury's finding of express malice was supported by substantial evidence, we reject these contentions. "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Here, reversal is not warranted merely because the

---

[20] Defendant correctly concedes on appeal that there was substantial evidence he was the gunman.

[21] "Defendant focuses on the alleged "lack of evidence on the ... distance of the one shot." While *People v. Smith, supra,* 37 Cal.4th 733, involved a "close range" shooting, and the opinion mentions that fact several times, its underlying reasoning is not limited to close range shootings. "Contrary to the argument advanced on this appeal, the evidence need not show in every instance a firing at point-blank range before the trier of fact may conclude that the shooter unambiguously intended to kill...." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.).

>     evidence in this case could conceivably be reconciled with an intent to merely injure Garcia. (See *ibid.*)

Perales, 2015 WL 114709, at *5–6 (footnotes in original).

Here, the California Court of Appeal noted California Supreme Court precedent provides that "the very act of firing a weapon in a manner that *could have* inflicted a mortal wound is sufficient to support an inference of intent to kill," which constitutes express malice. Perales, 2015 WL 114709, at *5. This determination is binding on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that Petitioner acted with express malice, i.e., an intent to kill. As noted by the California Court of Appeal, there was evidence that Petitioner fired a gun at the victim in a manner that *could have* inflicted a mortal wound. Mike Davis, who was present at the park with the victim Aaron Garcia, testified at trial that he observed the gunman say "get that one" and run towards Garcia. (2 RT[22] 126). Jose Contreras, who was standing in a parking lot across the street from the park, testified at trial that he observed three individuals chasing three other individuals southbound through the park. And "shortly after they crossed the street," Contreras heard a gunshot. (2 RT 139). When the pursuers returned to their car, Contreras heard the gunman say "something along the lines of 'I got him.'" (2 RT 146–47). The pathologist testified at trial that Garcia bled to death due to a single gunshot that entered his body in the back and penetrated the sternum. (2 RT 111–12).

Moreover, there was evidence that Petitioner had motive for the offense. Senior Officer Justin Vallin, a gang expert assigned to the Kings County Gang Task Force, testified at trial that the Norteños and Sureños are rival gangs, and that in his opinion the victim was a Norteño Varios Home Gardens gang member and Petitioner was an East Side Dukes Sureño gang member. (5 RT 613, 629–30, 650). Cesar Montera, who was present at the park with the victim,

---

[22] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on April 5, 2016. (ECF No. 18).

stated in a police interview[23] that as the gunman and his associates ran out of the car, they yelled out what "sounded like, like something Duke or . . . probably like East Side Duke or something" and the gunman yelled out "Sur." (1 CT 287, 293, 299). Montera stated that he was "pretty sure" the offense was a form of retaliation and mentioned the stabbing of someone named "Augustine." (1 CT 299). The gang expert testified about Augustine Mora, an East Side Dukes Sureño gang member who was the victim of a stabbing on March 1, 2011. (5 RT 631–32). The expert testified that if a Norteño stabbed a Sureño, the Sureños were expected to retaliate with greater force, and that Petitioner's actions benefited the Sureño street gang as a whole and Petitioner's position within the gang as well. (5 RT 661–62).

As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). Under this deferential standard of judicial review, the Court finds that a rational trier of fact could find that Petitioner acted with express malice. The state court's decision denying Petitioner's sufficiency of evidence claim with respect to express malice was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it must be denied.

### 3. Implied Malice

Petitioner raised the sufficiency of evidence claim with respect to implied malice on direct appeal to the California Court of Appeal, Fifth Appellate District, which declined to address the claim because it "ultimately conclude[d] there was substantial evidence of express

---

[23] The interview was recorded and played for the jury at trial. (2 RT 221–26).

13

malice." Perales, 2015 WL 114709, at *5 n.18. The California Supreme Court summarily denied Petitioner's petition for review. (LDs 9, 10). "Where there has been one reasoned state judgment rejecting a federal claim, [the Court presumes] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground" unless "strong evidence can refute" the presumption. Ylst, 501 U.S. at 803, 804. Therefore, the Court finds that the state courts did not reach the merits of this claim and it will be reviewed de novo. See Cone v. Bell, 556 U.S. 449, 472 (2009).

Under California law, "[m]alice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." People v. Gonzalez, 54 Cal. 4th 643, 653 (Cal. 2012) (citing People v. Knoller, 41 Cal. 4th 139, 152 (Cal. 2007)). As discussed in section IV(A)(2), *supra*, there was evidence admitted at trial that Petitioner had a gun in his hand, said "get that one" and ran towards the victim, chased the victim through a public park and across a street, took one shot that hit the victim in the back, and on his way back to the car stated something along the lines of "I got him." This evidence supports the required elements for implied malice: Petitioner fired a gun; the natural and probable consequences of firing a gun at, or in close proximity to, another person are dangerous to human life; and Petitioner knowingly acted with conscious disregard for the danger to life that the act posed. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it must be denied.

**B. Jury Instruction Claims**

1. Trial Court's Failure to Instruct on Involuntary Manslaughter

In his third claim for relief, Petitioner asserts that the trial court prejudicially erred in denying Petitioner's request to instruct the jury on involuntary manslaughter as a lesser included offense. (ECF No. 1 at 8). Respondent argues that this claim does not entitle Petitioner to habeas relief because the Supreme Court has declined to decide whether federal habeas relief is available for a court's failure to instruct on a lesser included offense in a non-capital case. (ECF No. 17 at 28).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's involuntary manslaughter instruction claim, the California Court of Appeal stated:

> Defendant also contends "his first degree murder conviction was improper because the jury was not instructed on involuntary manslaughter...." (*People v. Polley* (1983) 147 Cal.App.3d 1088, 1091.) Such a claim "is normally without merit." (*Ibid.*) Defendant's contention in this case is no exception.
>
> Here, the jury convicted defendant of first degree murder. This shows that the jury necessarily "found express malice, i.e., the intent to kill...." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 22.) "[H]aving reached this factual conclusion, the jury could not have found the defendant guilty of involuntary manslaughter. [Citation.]" (*Ibid.*) Therefore, even if the failure to give an involuntary manslaughter instruction was erroneous, that error was harmless. (*Ibid.*; see also *People v. Polley, supra,* 147 Cal.App.3d at pp. 1091–1092.)

Perales, 2015 WL 114709, at *6 (footnote omitted).

In Beck v. Alabama, the Supreme Court held that due process is violated in a *capital* case "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. 625, 627 (1980). Beck expressly declined to decide whether due process would require giving a lesser included offense instruction in non-capital cases. Id. at 638 n.14. The Ninth Circuit has declined to extend Beck to non-capital cases and held that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995)). However, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, including "entitle[ment] to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988). Here, the California Court

of Appeal found that any error in the trial court's failure to instruct on involuntary manslaughter was harmless. Assuming, without deciding, that the failure to instruct on involuntary manslaughter violated Petitioner's constitutional right to present a complete defense, the Court will proceed to determine whether the California Court of Appeal's harmless error analysis was contrary to, or an unreasonable application of, Chapman v. California, which held "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). See Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (holding that when a state court's harmless error "decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'") (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)).

Under California law, a "killing *without malice* 'in the commission of an unlawful act, not amounting to [a] felony' is involuntary manslaughter." People v. Thomas, 53 Cal. 4th 771, 814 (Cal. 2012) (alteration in original) (emphasis added) (quoting Cal. Penal Code § 192(b)). There was sufficient evidence of both express and implied malice, as discussed in section IV(A), *supra*, and given that the jury convicted Petitioner of first-degree murder, which necessarily entailed a finding of express malice,[24] it is not reasonably likely that the jury would have convicted Petitioner of the lesser offense of involuntary manslaughter if an instruction had been given. Therefore, the California Court of Appeal's harmless error determination was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim and it must be denied.

### 2. Pattern Instruction on Implied Malice

In his fourth claim for relief, Petitioner asserts that the trial court's pattern instruction on implied malice was prejudicially erroneous in that it inadequately stated the objective component

---

[24] "A person who kills unlawfully with implied malice is guilty of second degree murder." Gonzalez, 54 Cal. 4th at 653.

of implied malice. (ECF No. 1 at 10). Respondent argues that the state court's denial of this claim was reasonable and did not offend any Supreme Court precedent. (ECF No. 17 at 30).

Petitioner challenged the trial court's implied malice instruction on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's claim, the California Court of Appeal stated:

The trial court instructed the jury on implied malice as follows:

> "The defendant acted with implied malice if, one, he intentionally committed an act; two, *the natural and probable consequences of the act were dangerous to human life* ; three, at the time he acted he knew his act was dangerous to human life; and four, he deliberately acted with conscience [*sic* ] disregard for human life." (Italics added.) (See CALCRIM 520.)

Defendant claims that this instruction conveyed an impermissibly low threshold for finding implied malice. He takes issue with the portion of the instruction that describes implied malice as occurring if defendant "intentionally committed an act ... *the natural and probable consequences of [which] were dangerous to human life*...." (Italics added.) Defendant contends that this language fails to convey that the defendant's act must "involve[ ] a *high degree* of probability that it will result in death...." (*People v. Thomas* (1953) 41 Cal.2d 470, 480, (conc. opn. of Traynor, J.), italics added.)

*People v. Nieto Benitez* (1992) 4 Cal.4th 91 (*Nieto Benitez* ), is instructive. In that case, as here, the defendant argued the trial court "misstate[d] the law because [its] instructions omit[ted] a requirement that defendant commit the act with a *high probability* that death will result. [Citation.]" (*Id.* at p. 111, italics in original.) The Supreme Court disagreed and held that "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent...." (*Id.* at p. 111.)

The "linguistic formulation" used by the trial court in this case is very similar to the one upheld in *Nieto Benitez.* Here, the trial court instructed the jury that the defendant's act must be such that its "natural and probable consequences" are "dangerous to human life." This is virtually identical to the instruction in *Nieto Benitez* which required an act, " 'the natural consequences of which are dangerous to life....' " (*Nieto Benitez, supra,* 4 Cal.4th at p. 111.) We see no reason to distinguish the holding of *Nieto Benitez.*

Perales, 2015 WL 114709, at *7.

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72 (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147).

Here, the California Court of Appeal held that the challenged jury instruction accurately reflected state law, and that holding is binding on this Court. See Richey, 546 U.S. at 76 ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). Moreover, the jury convicted Petitioner of first-degree murder, which necessarily entailed a finding of express malice rather than implied malice. See Gonzalez, 54 Cal. 4th at 653. "[B]ecause the allegedly defective instruction was irrelevant to the jury's verdict, it could not have had a substantial and injurious effect on that verdict," Stanton v. Benzler, 146 F.3d 726, 729 (9th Cir. 1998), and the Court finds that Petitioner fails to demonstrate how the implied malice instruction "so infected" his trial in an unconstitutional manner. The state court's rejection of Petitioner's due process claim with respect to the implied malice instruction was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it must be denied.

///

///

///

**V.**

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 20, 2016**

UNITED STATES MAGISTRATE JUDGE